Filed 4/7/21  In re T.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re T.M., a Person Coming Under the Juvenile Court Law. | |
| J.P. and J.D., Petitioners and Appellants, v. SUPERIOR COURT FOR THE COUNTY OF HUMBOLDT, Respondent; HUMBOLDT COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES, CHILD WELFARE SERVICES, Real Party In Interest. | A160097, A160289 (Humboldt County Super. Ct. No. JV180169) |

T.M. was declared a dependent child after his parents died in a murder/suicide.  After initially being placed in emergency foster care, he was placed with his maternal grandmother (Grandmother), who was also caring for his half-brother, J.D. (Brother).  This placement continued for over a year, during which adoption was selected as the permanent plan and Grandmother indicated her desire to adopt T.M.

1

After the Humboldt County Department of Health & Human Services, Child Welfare Services (Department) learned T.M. was, to a significant degree, being cared for by other individuals and had been for a substantial amount of time, it filed a notice of intent to remove him from placement with Grandmother. The juvenile court issued an order to temporarily maintain the status quo, leaving T.M. where he was at the time, with his nanny. Following a contested hearing, the court granted the petition for removal and denied Grandmother's request for prospective adoptive parent (PAP) designation.

Grandmother, by appeal and writ petition, challenges these orders, as does Brother.[1]

## BACKGROUND

T.M. was detained by the Department in August 2018, when he was seven months old, after his father killed his mother and then himself. T.M. was found at the scene and transported to a local hospital.

T.M. was taken into protective custody, and the Department filed a petition under Welfare and Institutions Code section 300, subdivision (g)[2], alleging T.M.'s parents were deceased, and he was left without provision for support.

Law enforcement confirmed that Brother, then 12 years old, was not at the home, but was staying with Grandmother in Santa Cruz. Grandmother, 68 years old at the time, told the Department she was planning to move to

---

[1] We issued an order to show cause, consolidated the proceedings, deemed the writ petitions to also be Grandmother's and Brother's opening briefs, and stayed any final order of adoption.

[2] All further undesignated statutory references are to the Welfare and Institutions Code.

Humboldt County. She also told the Department she was "unable to handle a baby on top of the move." T.M. was placed with foster parents.

In an addendum report submitted in advance of the combined jurisdictional/dispositional hearing, the Department indicated Grandmother would move to Humboldt County by September 24, 2018. She "agreed [T.M.] should remain in foster care until she has relocated to Humboldt." Grandmother's "plan is to raise the two children together in the same home."[3] The Department reported "no concerns" about Grandmother's ability to care for the siblings other than her age. Concerns about T.M. included his eczema, a "severe allergy to eggs" and "a reaction to bananas as well."

The Department filed a second addendum report addressing visitation with paternal grandmother. The Department recommended up to six hours of supervised visitation and indicated paternal grandmother would notify the social worker a week before she came to Humboldt County to arrange a visit. The Department also recommended supervised visits with "family and friends upon request." The Department investigated other potential placements for T.M., including family members and non-related extended family members.

The court sustained the petition and declared T.M. a dependent child. The court ordered the "care, custody and control" of T.M. be vested with the Department, and authorized placement of the child in a suitable foster home, or with a suitable relative or non-relative extended family member. It ordered a section 366.26 hearing to be held within 120 days.

In its section 366.26 report, the Department indicated T.M. had been placed with Grandmother and Brother since October 2018. T.M. was being

---

[3] Grandmother is Brother's legal guardian, although the record does not indicate when that occurred.

3

treated for eczema, and testing indicated he was allergic to nuts, mold, and dust. He "experience[s] skin rashes after eating eggs and bananas."

As to the placement with Grandmother, the Department reported T.M. was "thriving," after initially exhibiting signs of depression in his foster placement. It recommended adoption as the permanent plan and stated Grandmother "moved to Humboldt County in October to care for her two grandsons. [She] is willing and able to provide [T.M.] with permanency in a safe and stable environment." The report indicated Grandmother "has many friends of her daughter who assisted in getting a home set up for the family."

Following the section 366.26 hearing, the court did not terminate parental rights, noting both parents were deceased. It found placement of T.M. with Grandmother was necessary and appropriate, and that it was likely he would be adopted.

The Department subsequently filed an adoption assessment addendum to the section 366.26 report. It stated T.M. "appears to be a happy and healthy child who has been in the care of his current Substitute Care Provider (SCP) since 10/10/2018. The care provider is his maternal grandmother. [T.M.'s] 12[-]year[-]old half[-]brother also resides in the home. The maternal grandmother moved to Humboldt County in October to care for her two grandsons. She is willing and able to provide [T.M.] with permanency in a safe and stable environment. [T.M.] is thriving in his current placement." Grandmother "made the informed decision that it was in her and the child's best interest to proceed with adoption. The care provider was screened for criminal history and prior Child Welfare Services (CWS) history and none was found."

In January 2020, the Department prepared a section 366.3 post permanent plan status review report. The report stated T.M. "remains

4

placed with his maternal grandmother and maternal [Brother] in Humboldt County. [T.M.] has a strong support system not limited to his grandmother and half-brother. [T.M.] attends an in-home daycare on weekdays and appears to benefit from the social stimulation. [T.M.] also has a nanny [Nanny] who has been in his life since birth." The Department noted T.M. has eczema and allergies to some foods and dust mites. He has a "prescribed Epi-Pen. [T.M.] is a healthy toddler." T.M. also had a periodic dental exam in June 2019. The report concluded T.M. "is getting his medical and dental needs met. He is in a stable placement with family and embraced by other adults who love and care for him on a consistent basis."

The court ordered adoption as the permanent plan and set a post-permanency planning review hearing for July.

In March, the Department filed a "Notice of Action" rescinding Grandmother's Resource Family Approval certification. A few days later the Department filed a notice of intent to remove T.M. Grandmother filed an objection to removal and a request for PAP designation.

In an attachment to its notice of intent to remove T.M., the Department detailed the reasons for removal. There were three primary areas of concern.

The Department's first concern was Grandmother's attitude towards men and fathers in general, and T.M.'s father in particular. Grandmother suffered from "pervasive grief and anger" regarding the murder of her daughter, who is the mother of both T.M. and his half-brother. The Department stated Grandmother "has had significant trouble reconciling that the man who murdered her daughter is [T.M.'s] father. . . . [¶] [Grandmother] has participated in mental gymnastics in order to help her make sense of who [T.M.] is. . . . [She] has difficulty with the concept of [T.M.] knowing of his father and is especially anxious about the fact that who his father is will

5

affect [T.M.] in several ways." The Department indicated Grandmother "was informed that [T.M.] will benefit from hearing positive aspects about his father that he can then relate to himself. Although what his father did was egregious, people are not in all totality bad." The Department suggested Grandmother make positive statements about T.M.'s father, such as " 'you run fast, your dad ran fast too.' " The Department noted that "Around age four, [T.M.] will likely start asking questions about his biological father." It also noted Grandmother's discourse "illustrates an overall disdain for men in general," and "her own ideology dismisses the importance of fathers."

The Department further indicated "Although [T.M.] is a light skinned, red headed child, he has African American ancestry from his biological father." It noted that, although Grandmother "appears to be a person who is very accepting of humanity and unbiased . . . she does not seem to understand the importance of her grandchildren having a broad understanding of their own ethnicity." "In dismissing this child's father as irrelevant, [Grandmother] is also dismissing the rich African American heritage that makes up half of the half[-]siblings['] genetic history."

The Department's second area of concern was that Grandmother was "providing less than 51% of the child's care and appears to be unable or unwilling to provide more than that." Grandmother is "overly reliant on other individuals to provide for [T.M.] financially, physically, developmentally, and emotionally." Grandmother raised Mother in "a cooperative community in which many of the adults, travelers, and permanent residents shared in the parenting of the children." "[Grandmother] has attempted to create the same environment in which she raised her daughter. [She] is ensuring that [T.M.'s] needs are met by relying on individuals who are volunteering their time and resources. . . . Especially

involved are Jordyn [the nanny] and Roxana. Upon the death of [Mother], these individuals stayed involved in order to support [Grandmother] in providing for [T.M.'s] and his half-brother's needs." The Department was concerned that Grandmother "did not communicate with the Department regarding how much time [T.M.] was being cared for by others." Grandmother believed "she and the individuals who have been helping to raise [T.M.] will continue to do so on some sort of shared property." The Department was concerned that Grandmother believes "the best circumstances in which to raise [T.M.] . . . is by a committee, not by a parent." The Department "spoke with [Grandmother] about how [she] needs to be the 'primary caregiver' for [T.M.]"

The third area of concern was regarding T.M.'s health care, which was partially related to the concern about Grandmother relying on others to help care for T.M. T.M. had been diagnosed with a number of allergies, had "an anaphylactic reaction to eggs at his previous foster home," and was prescribed an EpiPen. Grandmother initially asserted T.M. did not need an EpiPen. Later, she stated she did not know T.M. had an anaphylactic reaction and filled the EpiPen prescription.

Grandmother allowed a "friend of the family named Mary Jane" to care for T.M. on "multiple weekends" and come to T.M.'s medical appointments. Mary Jane supplied incorrect medical information, which was not corrected by Grandmother, at those appointments. Nanny also accompanies Grandmother to medical appointments because Grandmother is "squeamish." "[D]espite being told that she needs to be the primary person when it comes to [T.M.'s] medical care, [Grandmother] has signed documents allowing [Nanny] to seek medical treatment for [T.M.], and [Nanny] has taken [T.M.] to the doctor without [Grandmother] present." At a "Child and Family Team

meeting, the social worker spoke with [Grandmother] about . . . making 'the medical and dental appointments' and knowing all the information regarding [T.M.] so that she can keep [T.M.] safe."

Grandmother filed an Objection to Removal form on April 10. She indicated T.M. was bonded with her and Brother. She stated she had allowed T.M. to live with Nanny as a "calculated choice . . . based on a fiction that these people were 'family.' "

In late April, the Department filed a report in support of the change in placement, which included information about past events not included in previous reports. The new report noted that in November 2018, the Department received a "[m]onthly [c]ontact form" from Grandmother which stated: "child is still living with them, is in good health, and is too young to attend school regularly. Per Care Provider: He is only 11 months old. Glad I have to tell you this. What are you talking about-in school? How old do you think he is and why don't you know this information. I need a reply by Nov. 20, 2018." The Department indicated "This contact letter is one of the first indicators of many that conveys [Grandmother's] feeling regarding working with the Department." The January 2019 monthly contact form from Grandmother indicated "This is still not legal and completed + signed under duress W [&] I does not pertain." The following month, Grandmother stated "Leave us alone, we do not come under WIC 300 because I am his maternal grandmother and there was never abuse or neglect." The Department noted "Subsequent Monthly Contact Letters were not noted to be adversarial and were without additional comment."

The report also stated the current social worker was "introduced to the family" in April 2019. The social worker indicated she noticed "some of [T.M.'s] behaviors warranted watching over time. Although [he] seemed

8

comfortable in his environment, [he] was not babbling or making sounds that are typical of children his age and he had moments where he seemed to be dissociated." Grandmother reported she had many people supporting her with "financial help and childcare." When the social worker visited the following month, she spoke to Grandmother while Nanny fed him dinner.

When the social worker contacted Grandmother in June, Grandmother expressed "frustration over how long the adoption process was taking, stating . . . 'I have complied with every step of this bullshit process but I am getting ready to lawyer up and if that cost gets added in it will be in a legal complaint and be described as 'damages.'" During the home visit that month, the social worker provided Grandmother with the "required forms and information regarding adoption." T.M. had a "significant" rash on his face and elbows. Nanny was at the home and told the social worker T.M. had "sensitive skin and food allergies, and had had spaghetti for lunch at daycare that day which [Nanny] attributed to the breakout." The social worker was concerned that T.M.'s dental care was not up to date and that prior appointments had been cancelled. Grandmother stated he had seen a dentist a few days before and showed her paperwork from a dental practice. The social worker asked about payment because the practice did not accept MediCal, but Grandmother said she "did not know anything about that."

The following month, the social worker spoke with Nanny, who told her Grandmother was out of town and would return in three days. The social worker noted T.M. "might have hives on his neck, and a possible secondary infection in the eczema on his face." Grandmother had been sending T.M. to her friend Mary Jane's house "most weekends," and when he returned his eczema was "significantly exacerbated." The social worker told Nanny she was concerned about T.M.'s allergies, including an anaphylactic response to

9

eggs in his previous placement necessitating an EpiPen prescription, and asked if T.M. had an EpiPen at daycare and at the Willow Creek friend's house. Nanny stated T.M. did not have an EpiPen. A public health nurse confirmed with T.M.'s physician that he had been prescribed an EpiPen, but no one had picked up the prescription.

The Department then received a referral alleging T.M. "was experiencing neglect due to not having life[-]saving medication that was prescribed to him and being left with inappropriate caregivers who were not providing care for [his] medical needs."

On April 23, 2020, the juvenile court issued a temporary order of "removal," which maintained the status quo because T.M. was not living with Grandmother.[4] The court set a contested hearing for May 1 and ordered the Department to file an updated report.

Grandmother then filed a section 388 petition asking the court to nunc pro tunc recognize her as T.M.'s prospective adoptive parent and requesting an order recognizing the sibling relationship between T.M. and Brother, which the court also set for hearing on May 1. Attached to the section 388 petition was a typed, unsigned 2-page statement by Brother, stating he loved and missed T.M., that Grandmother had moved to Arcata to adopt T.M., and he did not understand why Nanny "should have any control over my brother. . . ." Also attached to the writ petition were two photographs, apparently of Brother and T.M. together.

The Department's report in support of the change in placement indicated a "childcare schedule provided by [Roxana] showed that in 2019

_____

[4] Grandmother filed a premature notice of intent to file a writ petition from the April order, which we deemed to be from the subsequent May 21, 2020 removal order.

10

[T.M.] was out of [Grandmother's] care for a minimum of 222 days," and during January and February 2020, was out of Grandmother's care "approximately 50% of the time." The report stated Nanny, without Grandmother, had taken T.M. to his pediatrician on December 19, 2019 because of concerns he was having "absence seizure[s]." One episode occurred when Grandmother and Nanny were present, but only Nanny was concerned. T.M.'s medical chart indicated his pediatrician "will be referring [T.M.] to neurology 'for evaluation for seizures versus staring spells.'" A few weeks later, Nanny again took T.M. to his pediatrician, who diagnosed him with "acute viral syndrome including congestion and rhinorrhea." Again, Grandmother did not attend. About six weeks later, T.M. had a scheduled "Child Health and Disability Prevention" exam, but Grandmother "was a no-show." T.M.'s immunizations were not up to date.

At the hearing, which took place on May 1 via Zoom, Grandmother's attorney stated the attachment to the section 388 petition was "a text message that I received from [Brother] in order to support his request." Counsel further stated, "It's my understanding that in lieu of testimony, the Department was willing to submit on that statement being taken as his declaration. And he is here available today if the Court needs to have him sworn in and have any cross-examination." The Department's attorney did not disagree and stated she "would like [Brother] to be available for cross-examination throughout the hearing today."

The court, in turn, stated "I did have a chance to read and consider [Brother's] statement that was attached to his grandmother's 388 request to change Court order." The parties raising no objections to Brother's written statement, the court admitted it and the two photographs into evidence. Brother appeared at the hearing but was excluded during Grandmother's

11

testimony since he was a potential witness. Ultimately, Brother was not called as a witness.

The social worker testified she received the case from another social worker in the summer of 2019. During that summer, the Department received a referral regarding T.M.'s placement with Grandmother. At a family team meeting, the social worker spoke with Grandmother about "concerns about [T.M.'s] health and whether or not he was safe, whether or not he had proper medications available . . . in case he had an allergic reaction." The social worker told Grandmother she had "concerns . . . this happened because other people were taking charge of certain portions of [T.M.'s] care." The social worker testified "at that time I started to become aware that . . . other people were engaging in normal parenting activities with [T.M.] and [Grandmother] was either not engaging and allowing other people to do it, or she was there but she wasn't necessarily present for the information that was being disseminated." The social worker was specifically concerned about Grandmother allowing T.M. to spend weekends with her daughter's friend Mary Jane, because T.M. would return from her home "a mess in terms of he had broken out in eczema, [which was] painful; there w[ere] hives, there appeared to be sometimes secondary infection starting. . . ." The social worker told Grandmother T.M. should have no more weekend visits with Mary Jane, and that Grandmother should be "the primary parent." The outcome of the referral was that Grandmother picked up the Epi-Pens, "reported she distributed them to his school and to [the Nanny]; everyone who cared for [T.M] had one. And she agreed not to let [T.M.] go to Mary Jane's." The social worker "made clear" to Grandmother that she had to take charge of T.M.'s medical care.

The social worker explained that under the Resource Family Approval process, if foster parents are using respite care, they need to notify their Resource Family Approval social worker. Grandmother did not follow those guidelines.

After the family team meeting, there was still "a clear pattern of other people taking charge of things." In particular, Nanny was making appointments and taking T.M. to the doctor. Nanny also made arrangements for circumcision surgery for T.M. to occur and was the one who contacted the social worker to see if a court order was needed. Nanny also relayed concerns to the social worker about T.M. having "absence seizures."

Despite the social worker's discussions with Grandmother about the need for her "to be [T.M.'s] person, . . . main attachment, and the person that cares for him the most," Grandmother continued to rely on others to be collectively the primary caregiver. The social worker learned Nanny "was coming over every morning, five days a week, and getting the child up, feeding his breakfast, taking him to daycare, picking him up from daycare between four and five, and bringing him home." She often observed Nanny "put him in his high[-]chair and she would feed him dinner." "[I]t became very apparent that [T.M.] was really only with [Grandmother] . . . 12 to 20 hours a week. . . . It was pretty significant."

By the end of January 2020, the social worker felt "someone is not telling me what's really going on." She learned Nanny and her partner had been caring for T.M. during December. Grandmother, however, had told the social worker she could not see T.M. that month because she was taking T.M. with her to Santa Cruz for Christmas and would not be back until January.

The social worker started the adoption assessment process, but "came to [her] supervisor and . . . said, 'I can't do this.'" An adoption assessment

13

involved a "way higher" standard than reunification. The social worker would have to explain "why this should be sanctioned as a forever home and forever relationship in terms of parent-child. And [she] couldn't write it . . . honestly and say that's true."

Grandmother testified that Nanny, who had been T.M.'s nanny when his Mother was still alive, was caring for T.M. at the time of the Department's notice of intent to remove him. Two other people besides Nanny also took care of T.M; her daughters' friends Roxanna and Mary Jane. Both T.M. and Brother often stayed with Roxanna, until she moved away in January 2020. Grandmother never notified the social worker about T.M. staying with Roxanna, but "she was aware of the situation." T.M. also stayed with Mary Jane a "[c]ouple of weekends a month." Grandmother did not "officially notify" the Department about those stays, either.

Grandmother acknowledged that in July 2019, the social worker had warned her it "was a problem for [T.M.] to stay with Mary Jane." This came about because Grandmother had gone to Santa Cruz, leaving T.M. and Brother in Nanny's care. Nanny called her and said Mary Jane wanted to pick up both boys, but she did not want Mary Jane to do that, and said she would call the police. Grandmother told her to call the social worker instead, which she did. After that, the social worker told Grandmother that T.M. should not spend the night with Mary Jane.

Grandmother testified she let T.M. stay overnight at Nanny's house "[o]nce or twice a month," but sometimes for more than one night at a time. On February 27, 2020, T.M. started staying with Nanny. According to Grandmother, this was because he was having a medically needed circumcision at Stanford Hospital. She met Nanny and her family at the hospital after driving there from Santa Cruz. Grandmother explained she

14

was "terrible with wounds and blood," but Nanny told her she and her family would " 'take care of this, so you don't even have to see the wound . . . [or] take care of it.' " She and Nanny had a conversation with the doctor about caring for T.M. After the surgery, T.M. continued to stay with Nanny because Grandmother was ill and hospitalized with what she thought was Covid-19. When she returned home, Brother also was ill and Grandmother vacillated between sickness and health. She asked Nanny to continue caring for T.M. while she was ill. Nanny brought T.M. to visit one time during that period, a few days before the March 24 family team meeting. Brother had a cough at the time, so "we made the decision [T.M.] would just go back" to Nanny's home. Grandmother did not report this to the Department. She did not start to feel better until about a week before the May 1 hearing.

Grandmother did not agree T.M. was cared for by others for as many days as the Department claimed. She explained the calendar which had the names of Mary Jane, Roxanna, and the Nanny on particular days, simply indicated their availability, not days on which they were necessarily caring for T.M. Grandmother testified that Roxanna paid for baby supplies to be shipped to Grandmother's house. Grandmother did not pay Nanny for caring for T.M., although she provided food when she was there and gave her "doggie bags for her boyfriend." Grandmother testified Nanny was "adamant" about not being paid, and she was surprised to discover Roxanna had been paying her.

Grandmother acknowledged she had sent a text to the Nanny that stated, " '[t]he reason you got to have [T.M.] . . . for 220 days [was] because I thought of you as family.' " She sent the Nanny another text that said " 'We were six inches away from adoption, at which point you could have had him as much or as little as you wanted.' "

15

Grandmother agreed that during October and November 2019, she left T.M in someone else's care for "about a 27-day stretch." She testified she often went to Santa Cruz because she had "renters. That was kind of my business." When she traveled to Santa Cruz, she stayed a minimum of four days "because it[ ] takes a whole day to drive down . . . and then a whole day to drive back." She did not spend Christmas in 2019 with T.M. because Nanny asked to have T.M. and Brother with her family for a Hanukah celebration, and the boys "had a plan" and wanted to go. Brother ultimately spent Christmas with Grandmother, but not T.M., who was cared for by Nanny for "[f]our or five days."

Grandmother explained that, although she had stated in the past she would not see T.M. if he was adopted by someone else, she still would want to be "connected" to him and "be there in any way I can." She questioned whether "just [doing] . . . videos for another couple of years and then he's going to get jerked back" was in T.M.'s best interests.

Grandmother believed she was capable of caring for T.M. full-time but explained, "I'm going to try to find some help. I mean, I'm not going to lie. You know, I thought I had a really sound support system. I love [Nanny] like family. And I thought we were all on the same page. And she was very helpful. And I'm going to have to fill that gap absolutely. If he comes back, I'm going to need some help."

Counsel for T.M. joined in the request to remove him from Grandmother and to deny her request for PAP or de facto parent status.[5]

---

[5] We grant the Department's previously deferred request for judicial notice. (Evid. Code, §§ 452, subds. (c), (d), 459.)

16

On May 21, the court issued an order denying Grandmother's request for PAP or de facto parent status.[6] It also concluded the Department "did not abuse its discretion when [T.M.] was removed from his grandmother" and found a change of placement was in T.M.'s "best interest." The court further found Nanny "has become the primary care provider for [T.M.], she has been raising the child, and [T.M.'s] primary attachment is to [the Nanny] and her partner." The order did not address Grandmother's request in the section 388 petition for recognition of a sibling bond.

## DISCUSSION

### *Legal Background*

Before addressing the issues raised by Grandmother and Brother, we explain briefly why the removal provisions set forth in subdivision (n) were added to section 366.26.

"In 2005, to strengthen the juvenile court's oversight and to protect the stability of children after parental rights are terminated, the Legislature enacted Senate Bill No. 218. (2005-2006 Reg. Sess.). (§ 366.26, subd. (n); Stats. 2005, ch. 626, p. 4666, eff. Jan. 1, 2006.) Section 366.26, subdivision (n) represent[ed] 'a paradigm shift in the standards to be applied to agency decisions in the narrow category of posttermination removal of children from designated prospective adoptive placements and gives to the court the wide discretion previously afforded the adoption agencies to determine whether the placement is in the best interest of the child.' [Citations.] [¶] In enacting section 366.26, subdivision (n), the Legislature intended to 'limit the removal of a dependent child *from his or her caretaker's home* after parental rights are terminated, *if the caretaker is a designated or qualified as a prospective adoptive parent*, as defined, in order to "protect the stability and best

---

[6] Grandmother's request for de facto parent status was made orally.

17

interests of vulnerable children." ' (Assembly Com. on Judiciary, com. on Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended June 2, 2005, p. 5.) The legislation was designed to correct the ' "nearly complete, unchecked authority" ' appellate courts had given to a child welfare agency to decide a dependent child's adoptive placement after termination of parental rights. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 218 (2005–2006 Reg. Sess.) as amended Apr. 7, 2005, p. 2, citing *In re Harry N.* (2001) 93 Cal.App.4th 1378. . . .) [¶] The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. (§ 366.26, subd. (n)(3)(B).) If a prospective adoptive parent objects to the child's removal from the home, the Agency must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests. . . . [T]he juvenile court determines whether the proposed removal of the child from the home is in the child's best interests, and the child may not be removed from the home unless the court makes that finding. (§ 366.26, subd. (n)(3)(B).)" (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 44–45 (*T.W.*), italics added & italics omitted.)

To effectuate its purposes, section 366.26, subdivision (n)(3) provides in pertinent part:

> "(3) Prior to a change in placement and as soon as possible after a decision is made to remove a child from the home of a designated prospective adoptive parent, the agency shall notify the court, the designated prospective adoptive parent or the current caretaker, if that caretaker would have met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1) on the date of service of this notice . . . of the proposal in the manner described in Section 16010.6.
>
> "(A) Within five court days or seven calendar days, whichever is longer, of the date of notification, the child, the child's attorney, the child's

18

tribe, or the designated prospective adoptive parent may file a petition with the court objecting to the proposal to remove the child, or the court, upon its own motion, may set a hearing regarding the proposal. . . .  A caretaker who would have met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1) on the date of service of the notice of proposed removal of the child may file, together with the petition under this subparagraph, a petition for an order designating the caretaker as a prospective adoptive parent for purposes of this subdivision.

"(B) A hearing ordered pursuant to this paragraph shall be held as soon as possible. . . .  At the hearing, the court shall determine whether the caretaker has met the threshold criteria to be designated as a prospective adoptive parent pursuant to paragraph (1), and whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest.  If the court determines that the caretaker did not meet the threshold criteria to be designated as a prospective adoptive parent on the date of service of the notice of proposed removal of the child, the petition objecting to the proposed removal filed by the caretaker shall be dismissed. . . .

"(C) A determination by the court that the caretaker is a designated prospective adoptive parent pursuant to paragraph (1) or subparagraph (B) does not make the caretaker a party to the dependency proceeding nor does it confer on the caretaker any standing to object to any other action of the department, county adoption agency, or licensed adoption agency, unless the caretaker has been declared a de facto parent by the court prior to the notice of removal served pursuant to paragraph (3).

"(D) If a petition objecting to the proposal to remove the child is not filed, and the court, upon its own motion, does not set a hearing, the child may be removed from the home of the designated prospective adoptive parent without a hearing. [¶] (4) Notwithstanding paragraph (3), if the State Department of Social Services, county adoption agency, or licensed adoption agency determines that the child must be removed from the home of the caretaker who is or may be a designated prospective adoptive parent immediately, due to a risk of physical or emotional harm, the agency may remove the child from that home and

19

is not required to provide notice prior to the removal. . . ." (§ 366.26, subd. (n)(3)(A)–(D).)

Subdivision (n) also sets forth the threshold criteria for qualifying as a PAP, specifying:

> "(N) Notwithstanding Section 8704 of the Family Code or any other law, the court, at a hearing held pursuant to this section or anytime thereafter, may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. In determining whether to make that designation, the court may take into consideration whether the caretaker is listed in the preliminary assessment prepared by the county department in accordance with subdivision (i) of Section 366.21 as an appropriate person to be considered as an adoptive parent for the child and the recommendation of the State Department of Social Services, county adoption agency, or licensed adoption agency." (§ 366.26, subd. (n)(1).)

With this background in mind, we turn to the issues raised by Grandmother and Brother.

### Grandmother's Challenge

Grandmother contends the juvenile court had no legal authority to issue the April 23 temporary "removal" order that maintained T.M. in Nanny's home pending the contested hearing on removal. While acknowledging she had not, at the time of the notice of removal, been designated a PAP, Grandmother claims she met the "threshold criteria" to qualify for such and therefore absent the " 'emergency' provisions of section 366.26," T.M. could not be removed prior to a noticed hearing.

As we have recounted, on April 2, the Department gave notice to Grandmother, with whom T.M. had been placed, of its intent to remove the child. Grandmother filed both an objection to removal and a request for PAP

20

status, which she requested be entered nunc pro tunc. The court promptly set a hearing.

At the hearing, held on April 20, the court appointed counsel for Grandmother. Appointed counsel then met with Grandmother and indicated to the Court, "[I]t was my understanding that the child is not physically placed in [Grandmother's] home. . . . It's my understanding that the child has not been residing with [Grandmother] due to concerns of illness, but that is a plan that [Grandmother] put in place . . . [¶] . . . placement has not changed." Counsel requested, and the court granted, a short continuance.

At the continued hearing, on April 23, counsel for the Department stated it "has not removed the child from the grandmother. . . . The grandmother has been told multiple times she can pick up the child. Obviously not when she is sick but prior to that and after that, and she has not done so."

Counsel for T.M stated the child was "doing quite well with what [Grandmother's] attorney is referring to as 'the nanny.' " Counsel noted "it is currently my understanding [Grandmother] has never provided for this child without extensive domestic help," and therefore she "would be uncomfortable with his immediate return today unless I had some assurances that this elderly woman is able to cope with the small child in her home with the distinct possibility that she will be caring for him by herself."

The court then issued a "temporary order" to remove T.M. "and not order the immediate return," set a contested hearing for May 1, and ordered the Department to file an updated report.

Although the April 23 order is phrased as one of temporary "removal" of T.M. from Grandmother's home, T.M. had, in fact, not been living in Grandmother's home for almost two months. Indeed, Grandmother's

21

attorney conceded at the hearing that T.M. was not living with her, asserting "[Grandmother's] position is she arranged for the child to be cared for by the nanny." Thus, under these unusual circumstances, the juvenile court did not "remove" T.M. from Grandmother's home. Rather, the court maintained the status quo that Grandmother, herself, had established, pending a full contested hearing.

As the Department observes, "courts have inherent powers which enable them to carry out their duties and ensure the orderly administration of justice. The inherent powers of courts are derived from article VI, section 1 of the California Constitution and are not dependent on statute. [Citations.] These powers entitle courts to ' ". . . adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council." [Citation.]' [Citation.] Thus, a trial court has the inherent authority to create a new form of procedure in a particular case, where justice demands it." (*In re Amber S.* (1993) 15Cal.App.4th 1260, 1264.)

But even if the temporary "removal" order was improperly issued, Grandmother has not demonstrated prejudice flowing from such error.

In her briefing, Grandmother asserted the temporary order "kept T.M. apart from Grandmother and the sibling" from April 2 (when the Department filed its notice of intent to remove T.M.) to May 20 (the day before the court issued the removal order[7]). But given that T.M. had not been with Grandmother for the prior two months, we fail to see how this additional separation was prejudicial, particularly in light of the fact that, as the

---

[7] The contested hearing was held on May 1, and the removal order was issued on May 21, 2020.

evidence presented at the evidentiary hearing showed, T.M. had not resided with Grandmother some 222 days during the prior year.

At oral argument, counsel for Brother expanded on the asserted prejudice of the temporary order leaving T.M. in Nanny's care. Counsel maintained the temporary order precipitated the court's denial of Grandmother's request for PAP status because Grandmother, as a result of the temporary order, was no longer the "current caretaker." The denial of PAP status led, in turn, said counsel, to the court applying the wrong standard at the contested removal hearing—whether the Department abused its discretion in removing T.M.—rather than the court, itself, finding removal from Grandmother's custody was in T.M.'s "best interest," as is required when a PAP objects.

To begin with, we disagree with counsel's assertion that the court based its denial of PAP status on the temporary order leaving T.M. with Nanny pending the evidentiary hearing. The court did not rule on Grandmother's status at the time it issued the temporary order, but did so following the evidentiary hearing. And based on the evidence presented at that hearing, the court found that "with the passage of time, [Nanny] has become the primary care provider for [T.M.], she has been raising this child, and [T.M.'s] primary attachment is to [Nanny] and her partner." Indeed, the evidence showed T.M. had not resided with Grandmother for even a total of six months during the prior year, spending at least 220 days living with others. In short, the record does not support the assertion the court denied PAP status because of its temporary order.

We also reject Grandmother's claim that she met the threshold requirements for PAP status and therefore the court "lacked discretion" to deny her request for such.

23

First, Grandmother is mistaken in claiming a caretaker seeking PAP status is entitled to such if she or he makes a threshold showing under subdivision (n)(1). Subdivision (n)(1) provides as follows: "Notwithstanding Section 8704 of the Family Code or any other law, the court, at a hearing held pursuant to this section or anytime thereafter, *may* designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. In determining *whether to make that designation*, the court may take into consideration whether the caretaker is listed in the preliminary assessment prepared by the county department in accordance with subdivision (i) of Section 366.21 as an appropriate person to be considered as an adoptive parent for the child and the recommendation of the State Department of Social Services, county adoption agency, or licensed adoption agency." (§ 366.26, subd. (n)(1), italics added.) The plain language of the statute thus states a court "may" designate a current caretaker a PAP, not that a court "must" or is "required" to do so. (See Seiser & Kumli, Cal. Juvenile Courts Practice & Procedure (2021), § 2.171[5][i]) ["The decision to designate the current caregiver as a prospective adoptive parent is one committed to the discretion of the court."].)

Further, as we have recited, while Grandmother was T.M.'s placement, she was not his actual caretaker on the date the Department filed its notice of intent to remove the child. T.M. had not lived with Grandmother for almost two months, and, as the evidence presented at the evidentiary hearing showed, he had not lived with her for 222 days of the prior year.[8] The court

---

[8] Although section 366.26, subdivision (n) provides the court "may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months," it does not specify

24

accordingly found, based on the evidence presented at the contested hearing, that "with the passage of time, [Nanny] has become the primary care provider for [T.M.], she has been raising this child, and [T.M.'s] primary attachment is to [Nanny] and her partner."[9] We understand that the instant case presented an unusual situation, where Grandmother was the designated *placement* for T.M., but was *in actuality* not his "current caretaker," nor was she his caretaker for much of the preceding year. But this circumstance was attributable solely to Grandmother, and given the record before it, the court did not abuse its discretion in denying Grandmother's request for PAP status.

In any event, Grandmother was accorded the procedural rights accorded to a PAP. Had she been designated as such, she would have been statutorily entitled to notice, an opportunity to object to the proposal to remove T.M., and a hearing on whether removal of T.M. was "in the child's best interests." The Department gave Grandmother notice of the proposed removal, the juvenile court appointed counsel for her,[10] and she objected to the proposed removal.

---

whether the six months must be immediately preceding the request, and we have identified no case discussing this requirement. Although T.M. may have lived with Grandmother for a combined total of at least six months, he did not live with her for the full six months preceding the notice of removal, nor did he live with her for at least six total months in 2019, given that he spent at least 222 days living with others.

[9] Although the court stated in its order issued after the evidentiary hearing "Neither prospective adoptive parent status nor de facto parent status is, at this time, appropriate for the maternal grandmother, as she is not now the child's placement," it explained Grandmother had not been T.M.'s *caretaker* since well before the temporary order.

[10] In fact, the court was not required to appoint counsel. "Nothing in the language of section 366.26, subdivision (n) or in the legislative history indicates the Legislature intended to provide that, in addition to the rights to receive notice, to object and to participate in the hearing, the prospective

25

Grandmother insists, however, she did not receive a hearing at which the court applied the "child's best interest" standard.

The juvenile court's written order stated in part: "Based upon the evidence presented . . . the Court makes the following findings: [¶] . . . [¶] 2) The Court respectfully denies grandmother's request to immediately return [T.M.] to her care given that [the Department] did not abuse its discretion when [T.M.] was removed from his grandmother. The Court affirms the decision of [the Department] to change the placement of the child, *and such change was in the best interest of* [*T.M.*] [¶] . . . The Court concurs with minor's counsel that, with the passage of time, [the Nanny] has become the primary care provider for [T.M.], she has been raising this child, and [T.M.'s] primary attachment is to [the Nanny] and her partner. It was gratifying, however, to receive evidence that [the Nanny] is very focused on [T.M.] having a continuing connection to his grandmother and brother. [¶] 4) The grandmother's request that the Court make alternative orders to rectify the issues or concerns raised by [the Department] is denied, as *it would be detrimental to* [*T.M.*] if these proceedings are further protracted. This young child needs and deserves permanence. Nonetheless, it is the Court's sincere hope and desire that [T.M.] be afforded the love and support of his grandmother . . . and his brother . . . to the greatest possible extent." (Italics added.)

---

adoptive parent also has the right to appointed counsel. If the Legislature had intended to provide to prospective adoptive parents the right to appointed counsel, it could have stated so in the statute. It did not. From this we conclude the Legislature did not intend to extend this right to prospective adoptive parents." (*R.H. v. Superior Court* (2012) 209 Cal.App.4th 364, 373.)

Grandmother points to the statement "the [Department] did not abuse its discretion when [T.M.] was removed from his grandmother" and maintains this shows the juvenile court applied only an "abuse of discretion" standard. However, this reads the statement out of context and ignores the court's subsequent, express finding that removal is "in the best interest of [T.M.]."

Grandmother further maintains the court's express finding can, and should, be ignored because the "[m]ere recitation of the words 'best interest' in the final ruling did not cure the error" We cannot agree that the court's finding that the Department had not abused its discretion in seeking removal is inconsistent with, and vitiates the court's *subsequent*, express finding removal was in T.M.'s "best interest." Furthermore, and contrary to Grandmother's assertion that a "detriment" finding is "what section 366.26, subdivision (n) requires, in essence," what a juvenile court is, in fact, required to determine is whether removal is in the child's "best interests." (§ 366.26, subd. (n)(3)(B); *T.W.*, *supra*, 203 Cal.App.4th at pp. 44–45.)

The "best interest" standard is multi-dimensional, encompassing more than just detriment. "The 'finding of detriment standard' and the 'best interest standard' are not legal equivalents. In general, under the detriment standard, . . . the party who is opposing placement has the burden to show by clear and convincing evidence that the child will be harmed. . . ." (*In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1256.) "The concept of best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citations.] A primary consideration in determining the child's best interest is the goal of assuring stability and continuity of care." (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286–287.) "[I]n

27

deciding what is in the child's best interest, the court properly considers the long-term nurturing and growth of the child, as well as the child's future physical, mental, and emotional needs. [Citation.] In this sense, the best interest standard is necessarily forward looking." (*In re L.M.* (2019) 39 Cal.App.5th 898, 911.) The court properly considers the child's current circumstances, which includes any sibling bond. (*Ibid*.) Given the evidence that was presented during the contested hearing, we certainly cannot say the juvenile court erred in finding removal from Grandmother was in T.M.'s "best interest."[11]

In sum, there is no merit to the claim of prejudice Grandmother elaborated on at oral argument, which ultimately turns on the assertion the juvenile court applied the "wrong standard" in ordering T.M.'s removal. No such error appears from the record.

### Brother's Appeal and Writ Petition

Brother also challenged the May 21 order by way of both an appeal and a writ petition. In his writ petition he alleged the juvenile court "impliedly denied [his] request to have his sibling relationship with [T.M.] formally recognized so as to enable him to fully participate in the proceedings on the Notice of Intent to Remove [T.M.]" and also joined in "the arguments presented in the petition . . . filed by [Grandmother]." In his reply brief, however, Brother "recognize[d] that he lacks standing to challenge the juvenile court orders denying Grandmother's request for prospective adoptive parent status and removing [T.M.] from Grandmother's custody," thus

---

[11] Indeed, Grandmother asserts only that the juvenile court applied the wrong standard in ordering removal, not that no substantial evidence supported the order of removal.

leaving only his complaint that his sibling relationship was not formally recognized.

As we have discussed, Brother did not file any request or pleading on behalf of himself.  Rather, Grandmother attached to her section 388 petition his typed, unsigned 2-page statement that he loved and missed T.M., that Grandmother had moved to Arcata to adopt T.M., and that he did not understand why Nanny "should have any control over my brother . . . ," as well as two photographs, apparently of Brother and T.M. together.  We therefore have some doubt that Brother qualifies as an aggrieved party in any respect.

In any case, no appeal lies from the challenged order.  (§ 366.26, subd. (n)(5) ["Except as provided in subdivision (b) of Section 366.28, an order by the court issued after a hearing pursuant to this subdivision shall not be appealable."].)  Indeed, Brother does not dispute that the only way he can challenge the May 21 order is by writ petition, and he further concedes he did not file a timely notice of intent to file a writ petition.[12]

---

[12]  California Rules of Court, rule 8.454, subdivision (e)(1) provides that the required writ proceeding is initiated by the filing with the juvenile court clerk of "a notice of intent to file a writ petition and a request for the record." (Rule 8.454, subd. (e)(1).)  The "notice of intent" must be "signed by the party or the attorney of record for that party." (*Id.,* subd. (e)(3).)  The rule thereafter contains explicit and detailed directions concerning notice, the preparation of the record, the content and filing of the writ petition itself, the disposition of the writ proceeding, and other related subjects. (*Id.,* subds. (e)(4), (g)–(i).)  To ensure expeditious resolution of the challenged ruling, the rule prescribes numerous, successive time limits applicable to the initiation and progression of the writ proceeding. (*Id.,* subd. (e)(4), (h)(2), (j)(2); see *Karl S. v. Superior Court* (1995) 34 Cal.App.4th 1397, 1402–1403.)  Included among these limits is a seven-day period from "the date of the posttermination order" within which the challenger must file the notice of intent and request for record.  (Rule 8.454, subd. (e)(4).)  All the time limits in the rule are mandatory.  (*Karl S.,* at p. 1404.)

He maintains, however, that "this court should construe [his] notice of appeal as a timely filed notice of intent to file a writ petition," asserting the juvenile court's "failure to provide timely and correct notice of its ruling and the proper avenue by which [to] seek appellate relief constitutes good cause" to excuse his failure to file a timely notice of intent to file a writ petition.

Brother relies on *In re Cathina W.* (1998) 68 Cal.App.4th 716, in which "the juvenile court, through no fault of the mother, failed to discharge its duty to give her timely, correct notice, as required by [former] California Rules of Court, rule 1462(c)(3)(I)." (*Cathina W.*, at p. 722.) The court clerk belatedly mailed the advisement to the mother four days after the order setting the section 366.26 hearing and misstated the date of that order by months, which effectively misinformed her of the deadline for filing the required notice of intent to file a writ. (*Id.* at pp. 722–723.) In addition, the clerk failed to resend the advisement after the mailing was returned to the court with a dated " 'Return to Sender' stamp" and "a label setting forth a new address" for the mother. (*Id.* at p. 723.) Under those circumstances, the *Cathina W.* court held relief was warranted. (*Id.* at p. 722.)

*Cathina W.* does not aid Brother. Even had Brother been a party to the dependency proceedings or filed the section 388 petition, "[n]either . . . [section] 366.28 nor the Rules of Court implementing [section] 366.28 contain any mandate that the juvenile court expressly advise the parties of the writ petition requirement. Therefore, noncompliance with the [section] 366.28 writ requirement is not excused by the juvenile court's failure to give minor's counsel such an advisement. [*A.M. v. Sup.Ct. (San Bernardino County Children & Family Services),* supra, 237 [Cal.App.4th] at 514-515. . . .]." (Eisenberg, et al., Cal. Practice Guide: Civil Appeal and Writs (The Rutter Group 2020) ¶ 2:164.18, italics omitted.)

In sum, the fact that the juvenile court did not give notice to Brother of the May 21 order does not constitute good cause for his failure to file a timely notice of intent to file a writ petition.

We therefore dismiss Brother's appeal and writ petition.[13]

## DISPOSITION

The May 21, 2020 order is AFFIRMED. Grandmother's writ petition is denied. Brother's appeal and writ petition are DISMISSED. The previously ordered stay of adoption proceedings is lifted.

---

[13] We note, however, that the record reflects that the juvenile court considered Brother's submission in support of Grandmother's objection to removal and section 388 petition.

31

_____
Banke, J.


We concur:


_____
Margulies, Acting P.J.


_____
Sanchez, J.


A160097/160289, In re TM